**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GERALD R. FORSYTHE, MICHELLE R. FAWCETT, MARSHA FOURNIER, MONICA BRESLOW, MELISSA S. FORSYTHE, and JOHN W. SALYER, JR., | ) ) ) ) ) |
| Plaintiffs, | ) |
| vs. | ) Case No. 04 C 5361 |
| BLACK HILLS CORP., DANIEL P. LANDGUTH, EVERETT E. HOYT, DAVID R. EMERY, MARK T. THIES, THOMAS M. OHLMACHER, RICHARD A. OSTBERG, and STEVEN J. HELMERS, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2000, plaintiffs Gerald Forsythe, Michelle Fawcett, Marsha Fournier, Monica Breslow, Melissa Forsythe, and John Salyer Jr. sold Indeck Capital, Inc. to defendant Black Hills Corp. The merger agreement governing the sale provided for an immediate payment to plaintiffs plus "earn-out" consideration to be issued over the ensuing four years. The earn-out was to be determined based on a percentage of the net income of Black Hills Generation Company ("Generation"), the entity that took over Indeck's operations. Plaintiffs allege that defendants, Black Hills and several of its officers and personnel, artificially depressed Generation's income by saddling it with interest payments on intercompany loans that plaintiffs say did not really exist or, at a minimum, carried artificially high interest rates.

Plaintiffs' original complaint named only Black Hills as a defendant. In their amended complaint, they added Daniel Landguth, who was chairman and chief executive officer of Black

Hills and Generation during certain relevant periods; Everett Hoyt, a director, president, and chief operating officer of Black Hills; David Emery, president and chief executive officer of Black Hills and Generation during certain relevant periods; Mark Thies, executive vice president and chief financial officer of Black Hills and Generation; Thomas Ohlmacher, senior vice president of Black Hills and chief executive officer of Generation at relevant times; Richard Ostberg, Black Hills' controller; and Steven Helmers, general counsel and corporate secretary of Black Hills and Generation. All of the individual defendants live and work in South Dakota.[1]

The amended complaint includes six claims. Count 1 is a claim of fraudulent misrepresentation against all the defendants; plaintiffs allege that the purported intercompany loans did not actually exist. Count 2 is a claim that Black Hills breached its obligation of good faith and fair dealing under the merger agreement by charging Generation interest on debt that did not exist, thereby reducing the amount of the earn-out payments. Count 3 is another claim against Black Hills for breach of good faith and fair dealing, alleged in the alternative to Count 2; in this claim, plaintiffs allege that if the intercompany debt actually existed, the interest rate charged to Generation was exorbitant. Count 4 is a claim against Black Hills for breach of a provision of the merger agreement requiring Black Hills to provide access to records relating to the earn-out determination; plaintiffs allege that after knowing that plaintiffs disputed the earn-out payments, Black Hills destroyed records that it was required to provide to plaintiffs. Count 5

---

[1] The Court previously overlooked the fact that the complaint and amended complaint identified only the states of residency of the individual parties, not their states of citizenship. The two are not the same. Plaintiffs are directed to verify in writing, within seven days after entry of this order, the state of citizenship of each plaintiff as of the date the lawsuit was filed, as well as the state of citizenship of each defendant as of the date the amended complaint was filed (the latter is out of an abundance of caution, at it likely would not affect the Court's subject matter jurisdiction).

2

is a claim against Black Hills for breach of good faith and fair dealing based upon the same alleged destruction of evidence. Count 6 is a claim for negligent spoliation of evidence.

Four of the individual defendants (Emery, Hoyt, Ohlmacher, and Ostberg) have moved to dismiss Count 1, the only claim against them, for lack of personal jurisdiction. All of the defendants have moved to dismiss the amended complaint for failure to state a claim.

## Discussion

**1.     Rule 12(b)(2) motion**

When personal jurisdiction over a defendant is challenged by way of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must make out a *prima facie* case of jurisdiction. When a motion is, like this one, decided on the basis of paper submissions, disputes in the evidence are resolved in favor of jurisdiction. *See, e.g., Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003).

This Court has personal jurisdiction over the individual defendants if an Illinois court would have jurisdiction over them. Fed. R. Civ. P. 4(k). An Illinois court has jurisdiction over a defendant to the extent permitted by the due process clauses of the United States and Illinois constitutions. 735 ILCS 5/2-209(c). The Seventh Circuit has indicated that there is no significant difference between the limits imposed on personal jurisdiction by the United States and Illinois constitutions, and thus the personal jurisdiction analysis collapses into a single inquiry focused on federal due process requirements. *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 715 (7th Cir. 2002). Under the due process clause, before an out-of-state defendant may be required to defend a case in the forum state, it must have "minimum contacts" with the state "such that the maintenance of the suit does not offend 'traditional notions of fair play and

3

substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

There are two types of personal jurisdiction: general and specific. Only the latter is at issue in this case. A court may assert specific jurisdiction over an out-of-state defendant when the minimum contacts standard is met and the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state. *E.g., Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 414 (1984). The defendant's contacts with the forum state must be of a nature and quality such that the defendant has fair warning that it could be required to defend a suit there. *Burger King Corp. v. Rudziewicz,* 471 U.S. 462, 472 (1985). This ensures that jurisdiction over a defendant is "not based on fortuitous contacts, but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue" and that "the defendant retains sufficient, albeit minimal, ability to structure its activities so that it can reasonably anticipate the jurisdictions in which it will be required to answer for its conduct." *Purdue Research Foundation,* 338 F.3d at 780.

Plaintiffs have met the constitutional standard for establishing personal jurisdiction. In particular, they have offered evidence that each of these defendants was involved in preparing the earn-out calculations, knowing or understanding that this information would be sent to plaintiffs in Illinois. A defendant's participation in the transmission of communications to Illinois to carry out a fraudulent scheme against Illinois residents is sufficient to confer this Court with personal jurisdiction over the defendant. *See, e.g., Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.,* 906 F.2d 272, 282 (7th Cir. 1990); *FMC Corp. v. Varonos,* 892 F.2d 1308, 1313 (7th Cir. 1990). Illinois has a significant interest in allowing its

citizens to obtain redress in this state for injuries they suffered within its borders, *see Calder v. Jones,* 465 U.S. 783, 790 (1984), and defendants have identified no undue burden in having to defend the case here. In sum, plaintiffs have made a *prima facie* showing of jurisdiction as to defendants Emery, Hoyt, Ohlmacher, and Ostberg. The Court therefore denies those defendants' motion to dismiss for lack of personal jurisdiction.

**2.      Rule 12(b)(6) motion**

   **a.      Count 1**

To sustain a fraud claim under Illinois law,[2] a plaintiff must establish that the defendant made a false statement of material fact, knowing or believing it to be untrue, for the purpose of inducing the plaintiff to act, and that the plaintiff actually and justifiably relied on the statement and was damaged as a result. *See, e.g., Cramer v. Ins. Exchange Agency,* 174 Ill. 2d 513, 528, 675 N.E.2d 897, 905 (1996).

Defendants make several challenges to Count 1, but the Court need deal with only one of them. The final element of a fraud claim, as summarized above, is proof that the plaintiff was damaged as a result of his reliance on the alleged fraudulent misrepresentations. *See Dresser Inds., Inc. v. Pyrrhus AG,* 936 F.2d 921, 934 (7th Cir. 1991) (Illinois law); *Cramer,* 174 Ill. 2d at 528, 675 N.E.2d at 905. At this stage of the case, of course, plaintiffs are not required to prove that they were damaged by their reliance on the alleged misrepresentations; rather, they need only allege it. They have not done so.

The type of causation required in a fraud case is proof that "had it not been for the fraud,

---

   [2] Black Hills argues that Illinois law governs the fraud claim contained in Count 1, and plaintiffs do not contend otherwise.

5

[the plaintiff] would have been spared an injury and thus would be better off." *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 524 (7th Cir. 1993). "The fraud," however, is the misrepresentation itself, not the underlying conduct that was misrepresented or concealed. Any injury that plaintiffs suffered stems from Generation's payment of interest on allegedly phony intercompany debt. Though plaintiffs may well be able to prove that they were lied to about the existence of the debt, their damage resulted from the interest payments, not from the lies. *See* Am. Compl. ¶ 51 ("These fraudulent reductions in net income, by charging purported interest on non-existent notes, have resulted in payment of a mere fraction of the amount actually owed to the Former Indeck Shareholders . . . .").

To put it another way, plaintiffs have not alleged that, as a result of defendants' misrepresentations, they changed their position in any way that resulted in harm. The only thing that comes anywhere within shouting distance of such an allegation is paragraph 54, in which plaintiffs allege that defendants "took steps to preclude the plaintiffs from being earlier aware of the fraud and the full amount of the Earn-Out Consideration to which they were entitled." *Id.* ¶ 54. This is not the type of reliance or causation required to sustain a fraud claim. An allegation that a plaintiff might have discovered misconduct sooner absent the defendant's misrepresentation is insufficient, *see Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, WL 1660814, *9 (N.D. Ill. July 23, 2004), unless, perhaps, the plaintiff contends that he was harmed by the delay – an allegation missing from plaintiffs' amended complaint in this case.

Plaintiffs have not alleged in their amended complaint that there was anything they did not do but would have done, that they did but would not have done, or that they would have done differently, had they known the truth. In their memorandum in response to the motion, plaintiffs

suggest that they would not have "accepted" the first year's earn-out calculation absent defendants' alleged misrepresentations, and that one of the plaintiffs would not have persisted in asking for copies of promissory notes evidencing the loans had he known the loans did not really exist. *See* Pls.' Opp. to Defs.' Non-Jurisdictional Motions to Dismiss at 15-16. But even there, plaintiffs do not hint at any way in which these alleged acts in reliance on the misrepresentations caused them harm. In plaintiffs' brief, they describe their claim of causation by saying they were "damaged to the extent that they have not received their full earn-out consideration." *Id.* at 17. This is damage caused by Generation's interest payments on allegedly phony debt, not damage caused by reliance on defendants' alleged misrepresentations about that debt. Plaintiffs also make, in a single sentence of their brief, a half-hearted attempt to suggest that they "have alleged that they were independently damaged through the fraud." *Id.* (citing Am. Compl. ¶¶ 11, 46, 60). But the paragraphs of the amended complaint that they cite to support this proposition say nothing of the kind; rather, they consist only of a general description of the relief plaintiffs seek in the case, an allegation that there is no documentation reflecting the actual existence of the loans, and a generalized statement that they were damaged in an amount "in the millions of dollars." *See* Am. Compl. ¶¶ 11, 46, 60.

For these reasons, the Court concludes that Count 1 fails to state a claim for fraud.

**b.     Count 2**

Count 2 is a claim for breach of merger agreement. Plaintiffs allege that "[i]n addition to the express obligation contained in [that] agreement . . . , there was an implied covenant of good faith and fair dealing," which Black Hills breached by charging Generation interest on nonexistent debt.

7

Black Hills' brief in support of its motion to dismiss contains a single-sentence argument in support of dismissal of Count 2: "Count II must be dismissed for the same reasons as Count I." Black Hills' Mem. at 16. Standing alone, this is a *non sequitur*; it is fairly obvious that the requirements for a fraud claim differ significantly from those for a breach of contract claim.

In its reply brief, Black Hills says that what it really meant by the argument in its opening brief is that "the basis of Plaintiffs' claims in both Counts I and II is the legal assumption that Generation's intercompany debt and related interest were 'nonexistent.' Therefore, Count II is subject to dismissal for some of the same reasons that Count I is subject to dismissal." Black Hills' Reply at 12. Specifically, Black Hills points to its arguments that plaintiffs do not have "standing" to challenge its existence based on the lack of promissory notes, and that the debt actually existed despite the existence of notes.

Black Hills' first argument amounts to tearing down a straw man. Plaintiffs are not seeking to challenge, as a shareholder might, Generation's entry into an *ultra vires* transaction.[3] Rather, they are saying that Black Hills, with which plaintiffs had a contract, cut the amount it owed on the contract by causing Generation pay out amounts that it did not owe. Plaintiffs quite obviously have standing to sue for an alleged breach of a contract to which they are parties.

Black Hills' argument that the debt actually existed cannot properly be adjudicated on a motion to dismiss for failure to state a claim. Black Hills supports this argument with certain board of directors meeting minutes that generally authorize management of Black Hills and Generation to enter into various types of intercompany transactions, including loans.

---

[3] This is not intended to suggest that plaintiffs would be barred from making such a challenge. *See* Pls.' Opp. to Defs.' Non-Jurisdictional Mot. to Dismiss at 10-11 n.3. To decide the present motion, te Court need not make, and does not make, any decision on that point.

The general rule is that on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint. Under Federal Rule of Civil Procedure 10(c), a copy of any written instrument attached to a complaint constitutes a part of the complaint. The Seventh Circuit has made it clear that this rule allows consideration, on a Rule 12(b)(6) motion, of "a limited class of attachments" that the moving defendant includes with his motion, even if they were not attached to the plaintiff's complaint. *Rosenblum v. Travelbyus.com Ltd.,* 299 F.3d 657, 661 (7th Cir. 2002). Specifically, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss. This exception is aimed at cases interpreting, for example, a contract." *Id.* (citations and internal quotation marks omitted).

Such is not the case here. The meeting minutes that Black Hills attaches to its motion are not "central" to plaintiffs' claims, nor are those particular meeting minutes referred to in the amended complaint. Nor, we might add, do those minutes suggest that the particular transactions at issue in this case were themselves authorized.

In sum, in the present circumstances it would be inappropriate to dismiss the amended complaint based on "facts," not contained in the complaint, that are directly contrary to plaintiffs' allegations. The contention that the intercompany loans actually existed is an issue for summary judgment or trial, not a motion to dismiss for failure to state a claim.

**c.     Count 3**

Count 3 is another claim against Black Hills for breach of a duty of good faith and fair dealing, asserted in the alternative to Count 2. In Count 3, plaintiffs allege that even if the

9

intercompany loans existed, that debt "was so excessive as to constitute a breach of the defendants' [sic] implied covenant of good faith and fair dealing" and that "[t]he burden of such excessive debt was further exacerbated by the defendants' business decision to charge discriminatory interest rates exceeding what were charged other subsidiaries." Am. Compl. ¶¶ 68-69.

Black Hills argues that Delaware law applies to this claim pursuant to an express term of the Merger Agreement stating that it is to be construed in accordance with Delaware law. Merger Agr. § 1. Black Hills contends that although Delaware recognizes an implied covenant of good faith and fair dealing in every contract, if the particular subject at issue "is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Amer., Inc.,* 622 A.2d 14, 22-23 (Del. Ch. 1992); *see* Black Hills' Mem. at 16. Black Hills cites a provision of the merger agreement, which was attached to the amended complaint, that contains a standard by which "material transactions" between Generation and its affiliates during the earn-out period would be judged. The provision states that

> Parent shall cause Newco to . . . refrain from entering into material transaction with affiliates of the Company unless such transactions are on terms and conditions no less favorable (when all aspects of the transactions are considered) to the Company than could be obtained from non-related parties . . . .

Merger Agr. § 7.7(iii).

It is undisputed that "Parent" in the passage quoted above means Black Hills and that "Newco" means Generation. Black Hills argues that "Company" *also* means Generation, and that as a result the provision directly covers transactions between Generation and its corporate affiliates. Plaintiffs argue that because the Merger Agreement specifically defined "Company"

10

as meaning Indeck Capital, Inc., the provision has nothing to do with transactions between Generation and *its* corporate affiliates, but rather concerns transactions between Generation and affiliates of Indeck Capital.

Though plaintiffs' interpretation follows the strict letter of the Merger Agreement, it makes no sense, as Black Hills points out in its reply brief. Plaintiffs have advanced no plausible reason why the parties to the Agreement would have had any interest or reason to regulate transactions between Generation and affiliates of Indeck Capital vis-à-vis the earn-out provision at all, let alone by a standard regarding whether such transactions were fair to *Indeck Capital*. The references to "the Company" in section 7.7 quite clearly are references to the same entity as "Newco" – i.e., Black Hills Generation.

Interpretation of a written contract under Delaware law is a question of law. *See, e.g., Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076 (Del. Super. 1992). The role of a court interpreting a contract is to carry out the parties' intent. *See, e.g., Lorillard Tobacco Co. v. American Legacy Found.,* 903 A.2d 728, 739 (Del. 2006). This determination, however, is constrained by the language the parties used, including any special meaning that they provided for any particular terms. *Id.*

Black Hills argues that no reasonable person in the contracting parties' position would have understood section 7.7's references to "Company" to mean Indeck Capital and that instead, any such reasonable person would have understood those references to mean Generation. Though Black Hills' argument makes sense, the Court is constrained by the language of the contract, absent a reformation of that language.

Black Hills argues, without citing any authority, that because the reference to "Company"

is clearly a drafting error ("scrivener's error," as Black Hills terms it), the Court may, in effect, reform the contract as part of its ruling on the present motion to dismiss. Based on the Court's own research, however, the Court is not convinced that the present motion presents the proper procedural vehicle for a reformation of the language of section 7.7(iii). The following discussion, from a recent Delaware decision, appears to accurately state the law governing contractual reformation in that state:

> The purpose of reformation is to make an erroneous instrument express correctly the intent of, or the real agreement between, the parties. The Court of Chancery has jurisdiction to reform a document to make it conform to the original intent of the parties . . . .
>
> [T]he Delaware Supreme Court describes the principles governing the doctrine's application:
>
>> Generally, reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.
>
> A party seeking reformation must establish the need for the remedy by clear and convincing evidence, and may introduce parol evidence to meet this burden. The existence of a scrivener's error, without more, is not sufficient to meet the "clear and convincing" test. The standard requires proof higher than mere preponderance, but lower than proof beyond a reasonable doubt. It requires evidence that would cause the trier of fact to believe that the truth of the factual contention is highly probable.

*Lions Gate Entertainment Corp. v. Image Entertainment Inc.,* No. Civ. A. 2011-N, 2006 WL 1668051, at *8 (Del. Ch. June 5, 2006) (citations and footnote omitted; bracketed material

added).

It is conceivable that parol evidence – that is, evidence outside of the terms of the contract itself – could be offered by plaintiffs to show that the literal reading of section 7.7(iii) is the correct one. For that reason, the Court believes that summary judgment, not a motion to dismiss, is the appropriate procedural mechanism for dealing with this point.[4]

For this reason, the Court declines to dismiss Count 3.

### d. Counts 4 and 5

Count 4 is another claim for breach of the Merger Agreement. The Agreement required Black Hills to "provide access for all work papers underlying the applicable Earn-Out Period Financial Statements" within a specified period after the end of each earn-out period and provided that if there was a dispute over the earn-out calculation, Black Hills was to provide plaintiffs' accountants "full access to the books, records, facilities and employees" of Generation. Merger Agr. §§ 2.3 & 2.6. In Count 4, plaintiffs allege that despite knowing that plaintiffs disputed the earn-out calculation, Black Hills destroyed backup tapes containing important information and failed to preserve computer workstations of seven key witnesses and that as a result, information related to the earn-out was lost. In Count 5, asserted in the alternative to Count 4, plaintiffs allege that these same actions constitute a breach of Black Hills' implied contractual duty of good faith and fair dealing.

Plaintiffs appear to acknowledge that their claim that the destruction of the backup tapes

---

[4] The Court notes that if Black Hills is correct in its reading of section 7.7(iii), plaintiffs may well have a viable breach of contract claim concerning that provision based on the theory that any intercompany loans and the interest rates charged did not meet the requirement that transactions be "on terms and conditions no less favorable to [Generation] than could be obtained from non-related parties."

13

and work stations violated section 2.3 of the Merger Agreement is at odds with the Court's prior interpretation of that provision – made without opposition by plaintiffs – that its reference to "work papers" meant the work papers of Black Hills' auditors. *See* Order of Mar. 21, 2005 at 3. Though the Court agrees with plaintiffs that the March 21 order granting partial summary judgment for Black Hills was a non-final order that is subject to reconsideration so long as the case is still pending in this Court, plaintiffs have not, as they promised in their response to the motion to dismiss, moved for reconsideration. *See* Pls.' Opp. to Defs.' Non-Jurisdictional Mots. to Dismiss at 20 n.8. That is a necessary first step; the ruling on the motion for partial summary judgment is the law of the case and cannot be changed unless plaintiffs show a good reason to do so. *See Carr v. O'Leary,* 167 F.3d 1124, 1126 (7th Cir. 1999).

That aside, however, plaintiffs have a viable claim for breach of section 2.6 of the Merger Agreement, which unlike section 2.3 is not limited to auditors' work papers. The Court rejects Black Hills' contention that this claim amounts to a mere "discovery issue[ ]" that is appropriately before the arbitrator who is dealing with the accuracy of the work-out financial statements pursuant to the Court's July 2005 order directing arbitration of plaintiffs' objections to those financial statements. *See also* Order of Mar. 21, 2005 at 2. Black Hills' compliance with section 2.6 is not the type of dispute that section 2.5 of the Merger Agreement says is to be determined by an independent accounting firm acting as arbitrator. For this reason, the Court declines to dismiss Count 4.

As noted above, Count 5 is plaintiffs' alternative claim that Black Hills' destruction of evidence violates the covenant of good faith and fair dealing that the parties agree is implied as part of the Merger Agreement. Black Hills' argument in support of dismissal is that to the extent

production of records is covered by an express provision of the Agreement, under Delaware law a claim for breach of a duty of good faith and fair dealing cannot succeed. *See supra* at 10. The Court agrees. The Merger Agreement specifically covers the subject of what documents Black Hills must provide to plaintiffs in the event of a dispute. Under Delaware law, which governs the contract, that provision trumps any claim for breach of an implied covenant of good faith and fair dealing concerning that same subject. The Court therefore dismisses Count 5.

      **e.      Count 6**

Count 6 is a tort claim for negligent spoliation of evidence, based on the same allegations that underlie Counts 4 and 5.

The first question is what state's law applies. This may be a critical question. It appears undisputed that Delaware does not recognize a cause of action for spoliation and that Illinois does. The parties have cited no law either way from the third state whose law might potentially apply, South Dakota (where Black Hills is located).

To determine what state's law governs a claim in a diversity action, a federal court applies the choice of law rules of the forum state, in this case Illinois. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941). To determine issues of choice of law, Illinois courts apply a "most significant contacts" test, derived from the Restatement of Conflict of Laws. *Ingersoll v. Klein,* 46 Ill. 2d 42, 45, 47-48, 262 N.E.2d 593, 595, 596 (1970). Under this test, when two or more jurisdictions have an interest in applying their law to a dispute, a court examines a variety of factors, including the needs of the interstate systems, the relevant policies of the forum and other interested states and their relative interests in the determination of the particular issue, the protection of justified expectations, the basic policies underlying the

15

particular field of law, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied. *See Jones v. State Farm Mut. Auto Ins. Co.,* 289 Ill. App. 3d 903, 917, 682 N.E.2d 238, 248 (1997); *In re Estate of Barnes,* 133 Ill. App. 3d 361, 366, 478 N.E.2d 1046, 1050 (1985).

If the conflict involves tort law, the law of the State that has "the most significant relationship to the occurrence and the parties" is applied. *Jones,* 289 Ill. App. 3d at 917, 682 N.E.2d at 248; *Barnes,* 133 Ill. App. 3d at 366, 478 N.E.2d at 1050. Important contacts that are considered to determine the state with the most significant relationship include the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile or residence of the parties, and the place where the parties' relationship is centered. *Id.* The analysis does not involve tallying contacts to determine which state has the most; rather, it requires an "interest analysis" involving "'consideration of the interests and public policies of potentially concerned states and a regard as to the manner and extent of such policies as they relate to the transaction in issue.'" *Id.* at 918, 478 N.E.2d at 248-49 (quoting *Mitchell v. United Asbestos Corp.,* 100 Ill. App. 3d 485, 493, 426 N.E.2d 350, 355-56 (1981)).

In this case the various factors and the "interest analysis" counseled by the Illinois courts do not clearly point toward application of a particular state's law. The analysis does, however, point away from Delaware. Though the parties agreed to have Delaware law govern interpretation of the Merger Agreement, Count 6 is a tort claim, not a breach of contract claim, and none of the parties is domiciled in Delaware. In short, none of the factors appropriately considered points in favor of applying Delaware law.

Assessment of the factors cited earlier does not provide a clear answer regarding whether

16

Illinois or South Dakota law should apply.  The injury occurred in Illinois, the allegedly tortious conduct occurred in South Dakota, the plaintiffs reside in Illinois while the defendants reside in South Dakota, and the parties' relationship cannot be said to be centered in either one of those two states.

Under the Restatement approach to conflict of laws questions, which Illinois generally follows, although the factors just cited – set forth in Restatement § 145 – are the governing factors, "[t]he applicable law will usually be the local law of the state where the injury occurred."  Restatement (2d) of Conflict of Laws § 156.  This is consistent with the Seventh Circuit's statement that "[i]n practice, . . . 'the law of the place of injury controls'" unless some other jurisdiction has a more significant relationship with the occurrence and the parties – which is not the case here.  *Fredrick v. Simmons Airlines, Inc.,* 144 F.3d 500, 504 (7th Cir. 1998) (quoting *Esser v. McIntyre,* 169 Ill. 2d 292, 298, 661 N.E.2d 1138, 1141 (1996)).

For these reasons, the Court concludes that Illinois law governs plaintiffs' negligent spoliation claim and that as a result, dismissal is inappropriate.  The Court notes that even had it determined that South Dakota law governs this claim, there would be no basis to dismiss the claim at the present juncture.  In that event, the Court would have to determine how South Dakota's highest court would address the issue (assuming, as Black Hills contends, there is no South Dakota law directly on point).  Because Black Hills provided the Court with no argument dealing with that issue, it would not have been entitled to dismissal of Count 6 even had the Court determined that South Dakota law applied.

## Conclusion

For the reasons stated above, the Court grants defendants' motions to dismiss in part and

denies them in part [docket nos. 109, 114]. Counts 1 and 5 of the amended complaint are dismissed for failure to state a claim. Defendants' motions are otherwise denied. Black Hills is directed to answer plaintiffs' remaining claims by no later than March 23, 2007. The case is set for a status hearing on March 20, 2007 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 12, 2007